**RAMU et al. v. Succession of VERGES.**

**No. 2315.**

Circuit Court of Appeals, First Circuit.
July 22, 1930.

ANDERSON, Circuit Judge, dissenting.

Hugh R. Francis, of San Juan, Porto Rico, for appellants.

O. B. Frazer, of San Juan, Porto Rico, for appellee.

Before BINGHAM, ANDERSON, and WILSON, Circuit Judges.

BINGHAM, Circuit Judge.

This is an appeal from a judgment of the Supreme Court of Porto Rico, in an action of ejectment (revindication) brought in the District Court of Guayama, on September 27, 1920, to recover the possession of two adjoining pieces of land of 86.56 acres (cuerdas), situated in the ward of Jobos, municipality of Guayama, which property the plaintiffs inherited from their mother, and which their father, Enrique Amy Pareno, as their legal representative, when they were minors, pursuant to two separate orders of a competent court authorizing their transfer, sold and conveyed by deed of March 12, 1895, to Eugenio Marcelino Verges, to whose estate the defendants succeeded as his sole heirs. In the action the plaintiffs also seek to recover some $60,000 in rents and profits, said to have been derived from the use of the property from 1895 to 1920.

The action was brought 35 years after the deed of the land here in question was given; about 10 years after Carmen, the youngest child of Amy, had reached her majority; and after both Amy and Verges were dead.

In the District Court, a demurrer to the complaint, on the ground that it did not state a cause of action, was sustained. But on appeal to the Supreme Court the demurrer was overruled, for the reason that the judicial authority Amy obtained from the competent court was to sell the property (the 86.56 acres); not to substitute it as security for other land, which the complaint alleged Amy had conveyed to Verges in 1886 to be held by him as security for his debt of 6,687.8 pesos; that the sale was simulated and the contract inexistent; that therefore the plaintiffs' rights did not depend upon a declaration of nullity and the action of revindication would lie, the same as if the deed of 1895 had never been made. Having reached this conclusion, the case was remitted to the District Court for answer and trial. After hearing, that court found for the plaintiffs, except as to profits, on the ground that the deed of March 12, 1895, did not comply with the authorization and was inexistent.

On a second appeal, the Supreme Court held that "the case developed by the evidence adduced at the trial revealed a situation quite different in its essential details from that indicated by the complaint." It reversed the judgment of the District Court and entered judgment for the defendants. When the case was before the Supreme Court on the first appeal, the orders of 1893 and 1894 of the competent court authorizing the sale of the 86.56-acre tract were not before the court. It did not then appear and had not then been found, as was afterwards found in the District Court, that Amy, at the time the orders were made, "was the owner of several (5) properties of different dimensions, situated in the ward of Aguamanil of Guayama, bounding with each other, and forming one property, the total capacity of which was of 81 acres more or less," which was a coffee plantation, made up of a property of 55.36 acres, one of 4 acres, one of 3¼ acres, one of 5 acres, and one of 14 acres. Nor at that time had certain other evidence from Verges' books, bearing on the nature of the transaction of 1895, here in question, been presented, as well as other evidence.

The principal question in the case is whether the deed of March 12, 1895, of the 86.56 acres, made by Amy to Verges was inexistent, incapable of conformation; or was existent and, though defective, capable of conformation, in which case the special defense of prescription of more than 4 years, set up in the answer, would bar the action.

It appeared that at the time this deed of March 12, 1895, was executed, the plaintiffs were all minors; that they were the children of Amy by his first wife, Juana Carlota Ramu, who had died in February, 1890; that in 1893 or 1894 Amy had remarried; that the plaintiffs were the owners of the 86.56-acre tract, consisting of two parcels of land in the ward of Jobos, each of which had 43.28 acres (cuerdas), and had been inherited from their mother. At this time their father, Amy, was the owner of the five properties in the ward of Aguamanil, where he lived, bounding each other and forming one property of 81 acres more or less, a coffee plantation.

At this same time, 1895, Verges was the owner of a property of 496.63 acres (cuerdas), also located in the ward of Aguamanil, which he acquired from Amy on June 30, 1886; Amy having deeded it to him in payment of a debt for 6,687.8 pesos, which he owed to Verges. This property of 496.63 acres adjoined the five properties of 81 acres (cuerdas), owned by Amy, and was also a coffee property. The 86.56-acre tract, owned by the children, was not a coffee property

and was situated in the ward of Jobos near the seacoast, at a great distance from the two tracts of Amy and Verges.

On August 12, 1886, after the execution of the deed of June 30, 1886, Verges in a private document, addressed to his testamentary executors, after reciting that he had become the owner of the 496.63-acre tract, by deed of sale of June 30, 1886, authorized them to "separate the said deed, I mean the Aguamanil property, from the rest of my estate, conveying the title of same to the said Juana Carlota Ramu Amy or her children, if she so prefers, and accepting as satisfaction in toto as value of said property, the payment to my succession in cash or in any other form, to the satisfaction of my executors, of whatever amount [her husband, Enrique Amy], may then owe me."

Amy's wife, Carlota, or Tututa, as she was sometimes called, was Verges' sister.

This was the situation in 1893 and 1894, when Amy applied to the competent court for permission to sell the 86.56-acre tract and obtained the two orders; and was the situation on March 12, 1895, when Amy made the deed of the 86.56-acre tract, the conveyance of which is now attacked as inexistent and incapable of conformation. Amy desired to reacquire the 496.63-acre tract, as it adjoined his 81 acres in the ward of Aguamanil and would enhance their value. At the same time it was difficult for him to take care of the 86.56-acre tract belonging to the children, of which he had the usufruct, because it was located "at a great distance from the place where the appearing party (Amy) lives." He therefore entered into a provisional arrangement with Verges to sell to him the 86.56 acres and with the proceeds purchase the 496.63-acre piece from Verges, Verges agreeing to donate the difference in the value of the properties as a gift for the benefit of Amy's children by his wife Carlota. To do this he needed judicial authorization, and in 1893 he presented a petition to the court requesting an authorization to sell. It turned out that through a mistake the first petition, and order thereon of July 22, 1893, was to sell only one of the two properties of 43.28 cuerdas going to make up the 86.56-acre tract. Accordingly on December 15, 1894, Amy filed a second petition asking judicial authorization to sell the other parcel also. The first petition has been lost from the files of the court. But the order on that petition has been found and was produced. It was made July 22, 1893, and authorized the sale of one of the 43.28-acre pieces. The second petition

and order are in existence and were produced. The order on this petition was granted December 20, 1894. The two petitions and orders have been regarded by the courts below as a single proceeding and as containing substantially the same phraseology, except that the first related to only half of the 86.56-acre tract and the other to the balance of it.

The petition of December 15, 1894, and order thereon of December 20, 1894, read as follows:

### "Petition

"To the Judge of First Instance,—

"Enrique Amy Pareno, resident of this City, married, of age and real estate holder, appears before Your Honor and alleges: that his minor children Josefina, Enrique, Dolores and Carmen, had during his first marriage to Juana Carlota Ramu Moret, are owners of 43 acres and 28½ hundredths of land, situated in the ward of Jobos, place known as Rio Seco, of this municipality (bounding it and stating from whom it was obtained), that *this property*, by means of the transaction I have agreed about, [and another piece] belonging also to my said children, with Eugenio Verges, for the sale of which pieces [piece] I requested and obtained judicial authorization from Your Honor by order of July 22, 1893, may reach a higher value than the price paid for it, and as it is a deal which is beneficial to my said children, over which I have the patria potestas, I am willing to carry it out, investing the proceeds thereof in the purchase of other property next *to or bounding with the property I own in the ward of Aguamanil*, thus giving to said property a higher value than the one it has at present. This will show that in due time the increased value of said property will benefit no other person but my children, but as in order to carry out the sale a judicial authorization is necessary, in order to show the utility of the alienation and so that the witnesses that I may introduce may answer according to the following questionnaire:

"1. According to the general provisions of law.

"2. So that they state that it is true and that they know personally that the property in question is not worth more than the price in which it was acquired by purchase, and that by virtue of the operations which I have pending with Eugenio Verges of other properties [the other half or piece of property] of my minor children, it will have a greater or higher value, for which reason they con-

sider the sale of the property mentioned of utility to the minors.

"3. That it is public and notorious that etc.

"Wherefore, I pray of your Honor to kindly allow this petition and consequently to authorize me, after hearing the District Attorney, to sell the property of 43 acres and 28½ hundredths, and ordering that the corresponding certificates be issued to me in order to use them whenever they may be necessary. I hope that this petition will be sustained by Your Honor.

"1. My daughter Josefina, being over fourteen years of age, in accordance with paragraph 1 of section 2011 of the Code of Civil Procedure, sign [signs] this petition with me to show that she agrees with same. Your Honor will kindly take note of this fact.

"2. That the certificates accompanied to this petition being required by me in the future, [I] kindly request that Your Honor order that as soon as this proceeding is determined, that they be returned to me, leaving of course the corresponding record.

"3. In the proceeding which I instituted last year about Declaration of heirs of my said children, I accompanied the required documents, and if any of said documents are necessary in the present case, I pray Your Honor to order the Clerk of this court, Mr. Capo, to issue whatever certificates may be necessary.

"Guayama, December 15, 1894.
"[Signed]    Enrique Amy,
                "Josefina Amy.

"Final Order.

"In the City of Guayama, December 20, 1894, before the Hon. Eduardo Ibanez Domenech, Judge of First Instance of said city and its district. Considering that Enrique Amy Pareno, as legitimate father of his children Josefina, Enrique, Dolores and Carmen Amy Ramu, had during his first marriage to Juana Ramu Moret, appeared requesting judicial authorization to sell 43 acres and 28½ hundredths of land, belonging to his said children, * * * which property is situated in the ward of Jobos, place known as Rio Seco, in this Municipality (describing it), in order to purchase other property *bounding with the plantation that said Enrique Amy Pareno owns in the ward of Aguamanil,* to which in this matter is given a greater value and said increase will in due time redound in the benefit of his said children. Considering that according to the testimony of the witnesses who testified at the trial, who were personally

known by the petitioner, it has been shown that the sale requested is beneficial to the minors. Considering that the District Attorney has rendered a favorable opinion. Considering that the authorization has been requested by the father of said minors, that the reason for the sale has been stated and the object in which the sum to be obtained will be invested, the utility of the sale having been justified and the District Attorney having been heard. Considering sections 154 and 164 of the Civil Code.

"It is ordered: That authorization should be granted, and it is hereby granted, to Enrique Amy Pareno to sell the 43 acres and 28½ hundredths of land above described belonging to his children Josefina, Enrique, Dolores and Carmen Amy Ramu by purchase from Antonio J. Alcaide, and whatever certificates of this authorization may be needed by the petitioner shall be issued to him. Making delivery of the documents to which the second 'Whereas' of the writing of the 15th inst. refers, after the corresponding motion for delivery has been filed, leaving due copy of same in the corresponding place. It was so ordered and signed by said Judge, before me, to which I certify.

                "Eduardo Ibanez.
"Attest: Alfonso E. Branderis."

The price or value of the two parcels comprising 86.56 acres was 1,600 pesos each, or 3,200 pesos.

Amy having obtained judicial authority to make the sale, on March 12, 1895, executed the deed to Verges conveying the two properties comprising the 86.56 acres. This deed states:

"This sale is made for the agreed price of 3,200 pesos, currency in use, which the vendor, Enrique Amy Pareno, declares he has received prior to the execution of this deed, for which sum he issues to the vendee the most solemn letter of payment or receipt."

On the same day in 1895 Verges sold and transferred by deed the 496.63-acre property to Amy; the price stated in the deed was 30,000 pesos, admitted to have been received, prior to the signing of the deed. This is the property which Amy sold and transferred to Verges in 1886 in payment of his debt, and which adjoins the other five pieces of 81 acres owned by Amy in the same ward of Aguamanil.

On the day of the execution of these two deeds, Amy and Verges signed a private document, the correct translation of which, ac-

cording to the Supreme Court (Rec. p. 316, bottom) reads· as follows:

"In duplicate. Arroyo, March 12, 1895. Enrique Amy and Eugenio Marcelino Verges being present, said: the first one, that in representation of his children surnamed Amy Ramu, he was selling to the second a·piece of property which the children acquired by maternal inheritance from the estate of their deceased great-grandfather Simon Moret, consisting in part of the 'Adela' property in the ward of Jobos, of Guayama, and 43 acres acquired by purchase from Luis Ramu, and, moreover, that the second party sold to the first, the coffee plantation at Guamani known as 'Trinidad' for a price of 30,000 pesos. The undersigned wish ·to state for the satisfaction of their children and of· anyone concerned, now and at any time, that the values contained or mentioned in the deeds executed today as above indicated, for one property as well· as for the other, are purely nominal and illusory, the truth of the case being simply a friendly agreement for the payment of 6,-667.80 pesos which Amy owed Verges, liquidated amount of their pending accounts, without interest, said amount [not] included (sic), Amy would arrange with his children [for the transfer of their interest from the one to the other in legal form]. In the above transaction no sum of money flowed by the undersigned.

"[Signed]    E. M. Verges,
"[Signed]    Enrique Amy."

On the same day, March 12, 1895, Verges made certain entries, in his own handwriting, in his books of account tending to explain the transaction between him and Amy. In his Journal for 1895 the following entry appears:

·"1895, March 12.   By friendly arrangement entered into with Enrique Amy, according to which I return to him the 'Trinidad' property, of Guamani, and receive in payment 86.56 acres (cuerdas) of grazing lands, belonging to his children, Amy Ramu, out of the 'Adela' property (Jobos), *property for property*, without a penny in cash having passed between us. The debt is one of $6,-667.86 [pesos] outstanding in my books against the 'Trinidad' property, and I have never charged him any interest, in consideration of his situation and for the benefit of his other children by Tututa. The titles to the properties have been conveyed today before notary Jose Mariano Capo, the Trinidad appearing (conventionally) at $30,000 [pesos], and the Jobos at $3,200 [pesos]. This is done in order to comply with the revenue law, but the transaction was made as I have stated and as it appears from a private instrument signed today by Amy and myself.

"I deliver the Trinidad property, of course, but the Jobos property is encumbered by a contract with Amoros .Brothers, which expires in 1900 and which I bind myself to observe in consideration of the payment of $266.71 [pesos] yearly, beginning with the first installment of 1894 (our agreement dating from 1893), and representing an interest of four per cent per annum on the debt of $6,667.86 [pesos] for the time that I may be deprived of the possession of the Adela property."

On the same page of the Journal under the same date appear the following counterbalancing entries:

March 12, 1895.   Enrique Amy to Estancia Trinidad. For· the transfer of said property by public deed, all expenses for execution, etc., included, to be charged to the account of Amy......  6,667.86 pesos

and,

Sundries,· to Enrique Amy—Real property.   By purchase from Enrique Amy of 43.28 .acres of land in the Adela plantation, situated in the ward of Jobos, Guayama, awarded to Tututa in partition of the estate of her grandfather Simon Moret. 1,600  pesos

Id. by a like parcel from Enrique Amy himself, awarded in the same manner to Luis Ramu, and purchased by Amy with money obtained from a life insurance policy of Tututa.... 1,600 - pesos

Total ...............3,200  pesos

E. M. Verges, Capital Account.  By a rebate in estimate which I make· in the account of Amy by virtue of this transaction, this sacrifice being made for the benefit of the minor children of Tututa, for which their father should provide security on the coffee plantation in Guamani... 3,467.86 pesos

Total .................6,667.86 pesos

In Verges' ledger showing his capital account, on the same day, he charged off against

his capital the balance of 3,467.86 pesos, as follows:

1895. March 12. Balance in the purchase of 86.56 acres of land, Jobos property, from E. Amy, as explained in the Journal...........3,467.86 pesos.

On September 24, 1895, Amy executed a deed entitled "Declaration of inherited property and mortgage bond to secure same," in which he states that his children had inherited from their mother properties to the amount of 44,263.57 pesos, and had also collected a life insurance policy in the amount of 1,600 pesos, total 45,863.57 pesos, which he, as their father, had received partly in cash and partly in property to manage for them; he acknowledges that he owes his children this amount and agrees to repay it to them whenever they have the capacity to receive it, and to guarantee such payment he proceeds in the same document to mortgage seven properties, which are the five properties in Aguamanil owned by him, the property of 496.63 acres purchased from Verges March 12, 1895, and a house and lot which he owned in the city of Guayama. The debt which he acknowledges and thus secures includes the price paid for the 86.56 acres which he sold to Verges.

But previous to the execution of this mortgage Amy had on March 22, 1895, executed a prior mortgage for 1,200 pesos on the 496.63 acres to Amoros Brothers, and on May 7, 1895, had executed a mortgage to the same parties for 2,000 pesos on the 55-acre tract which he owned in Aguamanil. The mortgage on the 496.63-acre tract was later sold at foreclosure sale.

At the time of the transaction here in question the Spanish Civil Code and the old Spanish Law of Civil Procedure were in force in Porto Rico; and the Mortgage Law was then and now is in force there.

By article 159 of the former Civil Code, the father is the legal administrator of the property of the children, who are under his control; and by article 163 he is made subject to the obligations of every usufructuary or administrator, and to the *special obligations* established by section 3, title 5, of the Mortgage Law. Article 164 of the Civil Code provides:

"Art. 164. The father, or the mother in a proper case, cannot alienate the real property of the child, the usufruct or administration of which belongs to them, nor encumber the same, except for sufficient reasons of utility or necessity, and after authorization from the judge of the domicile, hearing the department of public prosecution, excepting the provisions which, with regard to the effects of transfers, the Mortgage Law establishes."

The obligations above referred to in section 3, title 5, of the Mortgage Law are those stated in articles 157 and 168(2) and include the *legal mortgage* which a father must execute on his estate in favor of his minor children, to guarantee property belonging to them, in case he contracts a second marriage. These articles provide as follows:

"Article 157. Only those established in article 168 are legal mortgages."

"Article 168. A legal mortgage shall be made—

"2. In favor of * * * the children, on the estates of their parents, for those [properties] which the latter must set apart for them according to the law, and for those which belong to said children while they are minors in charge of the father or mother, in case the latter should remarry."

Article 200 of the Mortgage Law is in substance a repetition of the provisions of article 168(2) imposing a legal mortgage in favor of the minor children, in case the father contracts a second marriage.

By article 201 of that law, the children in whose favor a legal mortgage is established by article 200, in case the parent remarries, are given the *right to demand*: (1) "That realty belonging to them be recorded in their names;" (2) That as to property of theirs *other than realty*, the parent secure them by a special mortgage, if it can be done.

By article 202, the father is excused from giving the mortgages mentioned in article 201, in case "he does not have *any mortgageable real* property" on which he can place such mortgage.

By article 203, if the real property which the father possesses is *insufficient*, he may be required to create such mortgage on the real property he has, and to extend the same over real property, which he may subsequently acquire.

By articles 204 and 206, the exercise of the right to demand, given to the children by article 201, is extended to certain other persons acting "in the name of the children," to wit, (1) the persons from whom the property is derived; (2) the heirs or executors of said persons; (3) the ascendents of the minor; and (4) in case the persons mentioned in article 204 do not make the demand, then

the "public prosecutor may do so by reason of his duty."

By article 2011 of the Law of Civil Procedure, where the unemancipated child is over 12 or 14 years of age, according to sex, it is made necessary that such child shall also sign the petition for a decree of sale.

And by article 2014 of that law it is expressly provided that the only requisites to a sale of a minor's property by a parent, exercising parental authority, is that of "having first obtained judicial authority, with a hearing of the promotor fiscal and of the persons mentioned in articles 219 and 213 of the Mortgage Law."

It was under the provisions of these laws, and particularly under the provisions of article 164 of the Civil Code, above quoted, that the 86.56-acre tract, belonging to the children, was transferred by Amy to Verges by the deed of 1895. The plaintiffs apparently base their contention that that deed is an inexistent contract on two grounds: (1) That the transfer was not judicially authorized by the orders obtained, for the transaction was not a sale, but a substitution of securities, and not being judicially authorized the contract stated in the deed was prohibited by law, illegal and inexistent; and (2) that the contract lacked a consideration, which rendered it inexistent; that under the Civil Law a contract consists of three juridical acts—consent, an object, and a cause or consideration, every one of which is essential to its existence.

In explanation of their contention that the transfer was not judicially authorized, they say (1) that, instead of its being a sale of the 86.56-acre tract, it was a substitution of that tract, in the place of the 496.63-acre tract, as security for a debt of Amy to Verges of 6,687.8 pesos; and (2) that if it were a sale of the 86.56-acre tract and a purchase of the 496.63-acre tract with the proceeds obtained, or an exchange of the properties one for the other, the deed of the 496.63-acre tract should have been made in the names of the children, or to Amy as their representative, or if taken in Amy's name, he should have constituted a mortgage in the deed for the benefit of the plaintiffs, and that Verges should have seen that one of these methods was pursued.

The Supreme Court of Porto Rico, in passing upon the petition for judicial authorization and the two orders of sale, found that there was nothing in the petition or orders "to indicate that the same, or the testimony of the witnesses presented in support thereof, concealed from the court or failed to disclose, or in any way misrepresented the true character of the relations existing between Amy and Verges or of the proposed transaction already agreed upon by them." And as to the two private documents, the one of August 12, 1886, signed by Verges and addressed to his testamentary executors, and the other of March 12, 1895, signed by both Verges and Amy, upon which the plaintiffs rest their claim of a simulated sale and substituted security, the Supreme Court found "that there is nothing whatever in either of these writings to support the theory of a substituted security or a simulated sale or a fraud upon the court or a failure to comply substantially with the terms and conditions of the orders authorizing the sale" (Rec. p. 288); that although Verges' memorandum, of August 12, 1886, indicated that he intended to treat the deed of June 30, 1886 as a mortgage, "whatever the [undisclosed] understanding or agreement of the parties may have been," and although it was clear that no money changed hands in 1895, that it did "not follow that the conveyance of the property belonging to the plaintiffs in March of the year last mentioned was either a mere substitution of security for a pre-existing debt or without a good and sufficient consideration flowing from Verges directly or indirectly to the plaintiffs"; and that the memorandum signed by Verges and Amy March 12, 1895, did not "lend any additional strength to plaintiffs' theory of the transaction," or "mention or suggest a substitution of securities"; that "the consideration for the alienation of the property belonging to the plaintiffs was the conveyance by Verges to Amy Pareno of the property known as Trinidad, a coffee plantation many times larger in area, more conveniently located, and of much greater value than the two parcels acquired by Verges, and as far as the minors were concerned [was] the presumptive benefit and advantage accruing to them from the transaction as a whole, including, if not an expectancy in the property so acquired by the father, at least an obligation assumed by him to reimburse them upon becoming of age in a sum equivalent to the total amount to his previous indebtedness to Verges, and representing twice the value of the Jobos property, together with the promise and apparently increased ability of Amy Pareno to furnish proper security for the fulfillment of the obligation"; that "the net result would have been exactly the same if Verges had paid Amy six thousand six hundred and sixty-seven pesos and eighty-six

cents in cash in the presence of a notary, upon signature of the deed to the Jobos property; and if Amy had immediately returned to Verges, likewise in the presence of the notary, the identical bills or coin in question upon a signature of the second deed as the actual consideration for the release and transfer of the coffee plantation"; and that the entries in Verges' books removed "any possible doubt as to what actually occurred and as the true purpose and intention of the parties."

That court, in further considering the contention that the judicial authorization contemplated an investment of the proceeds of the sale "in a larger and more valuable tract adjacent to properties already owned by Amy Pareno in Aguamanil," to be transferred to the children, held that "the exchange of properties effected on March 12, 1895, was a substantial compliance with the terms and conditions of the orders in question, as far as Verges was concerned, unless the two orders containing such authorization can and should be so construed as to require a conveyance directly to the minors, or to Amy as their legal representative and expressly in trust for them, and as imposing upon Verges the duty and obligation of executing a deed in such form, or of insisting upon the creation in the same instrument of a first mortgage by Amy Pareno upon the property in question in favor of his minor children and by way of security for the protection of their interests."

It then points out that the two orders authorizing the sale do not contain any such provision or requirement, or "any clear intimation of such purpose or intention on the part of the court issuing the orders," and that in view of this it would not be reasonable to require Verges to take steps "for the protection of the minors, which might have been suggested by the Fiscal, or included by the court in its orders without the need of such recommendation, but which were never in fact so suggested or included, nor apparently at any time in the mind of any of the parties concerned."

Having reached the conclusion that the orders imposed no duty upon Verges in the respects above mentioned, it reviewed the provisions of the former Civil Code and the Code of Civil Procedure, to which we have referred, relating to the exercise of the patria potestas, to see what *statutory* duties were imposed upon the purchaser (Verges), contrasting the provisions of the former codes with those of the present, relating to the same matter. It prefaced its discussion by saying that in order to get the "true and proper perspective, both Codes [the old and the new] must be construed in the light of their history and high regard for the sanctity of the patria potestas and for the presumptive purity of motive underlying and governing the exercise of that power."

In reviewing these provisions of the Codes, the court points out that prior to the enactment of article 164, the father, with patria potestas, could alienate the property of his children inherited from their mother, without judicial authorization; but that the property of the father thereupon became incumbered in favor of the children, who, in case the property of the father was not sufficient to meet their interest, could claim and sue for any of their property which the father had alienated, if they did not care to inherit from him; that whether article 164 was enacted for the protection of the purchaser as against the minors (as some authorities contended) or not, it clearly placed a limitation on the power of the father; and more recent legislation in Porto Rico had provided still further protection to minors by conferring upon the court and fiscal powers they formerly did not have and imposing duties that did not formerly exist, such as requiring the judge in his decision (order) to determine how the thing acquired (the consideration or price) is to be invested, and making it the duty of the fiscal to see that the decision is carried out. But that under these laws the failure of the parent to reinvest the purchase money, as required by the order authorizing the sale, did not affect the title of the purchaser who had parted with his money; that if this was so under the new laws, "a fortiori, in 1895, in the absence of any such statutory requirement [as to re-investment of sale's price] and in the absence of any specific provision in the order authorizing a sale or alienation of real estate, the responsibility for a proper performance of an implied duty upon the part of a parent, in connection with a contemplated re-investment of proceeds or the execution of a mortgage or the giving of other security for the protection of minor children, could hardly be said to rest upon the shoulders of a purchaser of the real estate so alienated or upon those of a vendor of property conveyed to the parent of such minors with a view to the subsequent encumbrance thereof for their benefit and advantage."

Having absolved Verges from any duty, statutory or otherwise, as to the reinvestment

of sale's price or mode and form of conveyance, the court then considered *Amy's* duties and responsibilities, and held that under the provisions of the Codes, here referred to, Amy was under no obligation to mortgage his property for the benefit of his children, until he remarried; that the judge who authorized the sale in 1893 and 1894 knew that Amy was under no restraint or control, in the use or disposition to be made of the proceeds of the sale of the 86.56-acre tract; or the property received in exchange therefor, beyond the statutory obligation to execute a mortgage in favor of the children when he remarried, upon the real estate which he then owned or subsequently acquired; and which he could be required to do by the executors of the deceased mother or the fiscal, if he did not do so voluntarily; that if the giving of such mortgage might have been made in the order a condition of the sale of the 86.56-acre tract, it was doubtful if any precedent for it existed in the annals of Spanish jurisprudence; that none in fact was made; that on the contrary the judge "left the performance of the duties and obligations imposed by law upon Amy Pareno entirely to him under the general provisions of that law"; and that under the circumstances the authorization for the sale of the 86.56 acres was "unconditional and unqualified" and found that this was the understanding of all parties concerned at the time and for many years thereafter.

So far as the above statements from the opinion of the Supreme Court contain findings of fact, they are conclusive and not subject to review by this court, for this suit is an action at law in which only questions of law are reviewable here on appeal. Ana Maria Co. v. Quinones, 254 U. S. 245, 41 S. Ct. 110, 65 L. Ed. 246; Id. (C. C. A.) 251 F. 499; Societe Anonyme des Sucreries de St. Jean v. Polanco (C. C. A.) 6 F. (2d) 3; Sucesores de Perez Hermanos v. Costa (C. C. A.) 281 F. 439. No question is raised as to there being no evidence in their support, and none could be, for there was sufficient evidence from which the findings could be made. And so far as they involve rulings of law they relate entirely to the construction and application of local laws, which rulings this court will not set aside unless we are of the opinion that they are clearly wrong. Cardona v. Quinones, 240 U. S. 83, 36 S. Ct. 346, 60 L. Ed. 538; Martinez v. Mendez (C. C. A.) 256 F. 596, 600; Plazuela Sugar Co. v. Pastoriza (C. C. A.) 245 F. 115; Richardson v. Fajardo Sugar Co. (C. C. A.) 237 F. 195. See also Diaz v. Gonzalez, 261 U. S. 102, 105,

106, 43 S. Ct. 286, 287, 67 L. Ed. 550, where the Supreme Court of the United States deals with the question of "the deference due to the understanding of the local courts upon matters of purely local concern."

Not being of the opinion that the rulings were clearly wrong, the judgment of the court below must be affirmed.

The judgment of the Supreme Court of Porto Rico is affirmed, with costs to the appellee.

ANDERSON, Circuit Judge, dissents.